Filed 8/1/24  P. v. Mendez CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B330671 |
| Plaintiff and Respondent, | Los Angeles County Super. Ct. No. VA028945-02 |
| v. | |
| LUIS MANUEL MENDEZ, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Lisa S. Coen, Judge.  Affirmed.

Law Offices of Nina Bonyak and Nina Bonyak for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Mathews and Daniel C. Chang, Deputy Attorneys General, for Plaintiff and Respondent.

Luis Manuel Mendez has lived in the United States as a lawful permanent resident since 1992.  In 1995, a jury convicted Mendez of second degree robbery, and a court sentenced him to three years in prison.  More than two decades after being released from prison, Mendez explored the possibility of becoming a United States citizen.  However, he learned his robbery conviction rendered him permanently ineligible for naturalization.

After making this discovery, Mendez filed a motion to vacate his conviction under Penal Code section 1473.7.[1]  According to the motion, sometime before Mendez's trial, the People offered him a favorable plea deal.  Mendez rejected the deal without realizing the potential immigration consequences of that decision.  Mendez asserted, had he known a conviction after trial might permanently preclude him from becoming a citizen, he would have accepted the plea deal instead of going to trial.

The court denied Mendez's motion, finding he failed to show he would have accepted the plea deal had he realized the immigration consequences of his decision to go to trial.  Applying our independent judgment, we come to the same conclusion.  Accordingly, we affirm the court's denial of Mendez's motion to vacate his conviction.

## FACTS AND PROCEDURAL BACKGROUND

Mendez was born in Mexico in 1975.  He moved to the United States and became a lawful permanent resident (LPR)

---

[1]     Undesignated statutory references are to the Penal Code.

in 1992.[2]  Mendez's mother, father, and siblings are naturalized United States citizens.

In 1995, a jury convicted Mendez of second degree robbery (§ 211) and found true a firearm enhancement allegation (§ 12022, subd. (a)(1)).  The trial court sentenced him to three years in prison, consisting of the low term of two years for the robbery, plus one year for the firearm enhancement.  The court gave Mendez credit for 229 days in custody, which included 153 days of actual custody.

Mendez remained in the United States after serving his prison sentence, and he renewed his LPR status twice.  Mendez met his wife in 1997, and they married a few years later.  They have two children together.  At some point, Mendez started working as an aviation technician.

Federal agents detained Mendez in 2015.  The federal government sought to remove him from the United States, citing his robbery conviction.  In 2019, an immigration judge granted Mendez a waiver that allowed him to remain in the United States, despite the conviction.

After receiving the waiver, Mendez decided he wanted to work for the Federal Aviation Administration (FAA).  Mendez learned that to be eligible for that type of work, he would need to become a United States citizen.  Initially, Mendez believed he was eligible to apply for citizenship.  However, he discovered

---

[2]  According to Mendez's counsel, Mendez moved to the United States in 1989 or 1990, when he was 14 years old.  However, counsel did not point to evidence to support that assertion, nor have we found any in the record.

3

his conviction constitutes an aggravated felony, which renders him permanently ineligible for naturalization.

In July 2022, Mendez filed a motion in superior court to vacate his robbery conviction under section 1473.7. According to Mendez, at a pretrial hearing for his criminal case, "the Public Defender informed [him] that the District Attorney assigned to [his] case offered a plea deal. The deal was to plead guilty and receive credit for time served and 3 years probation." Because the plea deal required Mendez to serve less than a year in custody, the conviction would not have qualified as an aggravated felony or rendered Mendez permanently ineligible for naturalization.

Mendez asserted his defense counsel never asked him about his immigration status, suggested he talk to an immigration lawyer, or explained "what could happen if [he] lost at trial." Accordingly, Mendez "didn't know that accepting the plea deal would not have had any immigration consequences, and [he] would have been eligible to become a citizen." Had Mendez "known that [he] would receive 3 years of jail time, on top of the time [he] had already spent in custody, [he] never would have gone to trial." Instead, he "would have gladly taken the plea deal . . . . No one talked to [him] about the Immigration consequences, and if they had, [he] would have made different choices."

Mendez supported his motion primarily with his own declaration, in which he asserted most of the facts summarized above. Mendez also submitted documents related to his immigration case, letters of support from family and friends, a letter of reference from an aircraft maintenance technician, and several documents related to FAA jobs.

4

The People opposed the motion, arguing Mendez's primary motivation for going to trial was to prove his innocence. The People pointed out that Mendez risked a significant prison sentence by turning down an offer of probation. According to the People, because Mendez was focused on proving his innocence, he likely would have gone to trial even if he had known the immigration consequences of that decision.

At a hearing to consider the motion, the court asked Mendez's counsel why he waited so many years to apply for citizenship. Counsel responded that Mendez could not apply for citizenship until he turned 21 years old. Counsel did not explain why Mendez had not applied for citizenship in the 26 years since he turned 21 years old.

The court denied the motion without prejudice, noting the lack of evidence corroborating Mendez's contention that immigration consequences were his priority when he rejected the plea deal.

Mendez timely appealed.

## DISCUSSION

### 1. *Relevant law and standard of review*

Effective January 1, 2022, section 1473.7 allows a noncitizen convicted of a crime to move to vacate a conviction or sentence that "is legally invalid due to prejudicial error damaging the [noncitizen]'s ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a conviction or sentence." (§ 1473.7, subd. (a)(1); Stats. 2021, ch. 420, § 1.) The statute applies to individuals, like Mendez, convicted after a jury trial. (*People v. Carrillo* (2024) 101 Cal.App.5th 1, 5 (*Carrillo*).)

The moving party bears the burden to prove by a preponderance of the evidence that he is entitled to relief under section 1473.7, subdivision (a).  (§ 1473.7, subd. (e)(1).)  To meet that burden, the party must show (1) he did not meaningfully understand the immigration consequences of his conviction or sentence, and (2) his misunderstanding constituted prejudicial error.  (*Carrillo, supra*, 101 Cal.App.5th at p. 14.)  "[A] defendant who decides to go to trial, loses, and is sentenced can establish prejudice for purposes of section 1473.7, subdivision (a)(1) by showing there is a reasonable probability that (1) he or she would have done something differently—that is, would have taken another 'path' [citation]—and (2) the alternate path would have resulted in an immigration-neutral outcome."  (*Id.* at p. 20.)

To determine whether there is a reasonable possibility the moving party would have taken a different path, the court must consider the totality of the circumstances.  (*People v. Espinoza* (2023) 14 Cal.5th 311, 320 (*Espinoza*).)  Relevant factors include the party's ties to the United States, the importance the party placed on avoiding immigration consequences, the party's priorities, and whether the party had reason to believe an immigration-neutral disposition was possible.  Also relevant are the probability of obtaining a more favorable outcome if the party had taken the alternative path, as well as the difference between the likely alternative-path term and the likely term if convicted at trial.  (*Ibid.*)

We independently review the denial of a motion to vacate a conviction under section 1473.7.  (*People v. Vivar* (2021) 11 Cal.5th 510, 523–524 (*Vivar*).)  Under that standard of review, we exercise our independent judgment to determine whether the facts satisfy the rule of law.  (*Id.* at p. 527.)  In doing so,

6

we give deference to the trial court's factual findings based on its personal observations of witnesses.  (*Ibid*.)  "Where, as here, the facts derive entirely from written declarations and other documents, however, there is no reason to conclude the trial court has the same special purchase on the question at issue; as a practical matter, '[t]he trial court and this court are in the same position in interpreting written declarations' when reviewing a cold record in a section 1473.7 proceeding.  [Citation.] Ultimately it is for the appellate court to decide, based on its independent judgment, whether the facts establish prejudice under section 1473.7."  (*Id*. at p. 528, fn. omitted.)

2.  ***Mendez has not met his burden to show prejudice***

Mendez argues he is entitled to relief under section 1473.7 because he failed meaningfully to understand the immigration consequences of rejecting the People's plea deal and going to trial.  Specifically, he argues he did not understand that losing at trial would permanently preclude him from becoming a citizen. Nor did he understand he would not have suffered the same immigration consequences had he accepted the People's plea deal. Mendez contends he was prejudiced by these misunderstandings because, had he known the potential immigration consequences, he would have accepted the People's plea deal instead of going to trial.

Mendez's argument arises out of the fact that the immigration consequences of a theft conviction depend on the length of the sentence imposed.  Under federal law, a person convicted of an "aggravated felony" is permanently barred from becoming a citizen.  (8 C.F.R. § 316.10(a)(1), (b)(1)(ii).)  The Immigration and Nationality Act lists the crimes that qualify as aggravated felonies.  (See 8 U.S.C. § 1101(a)(43).)  Some crimes—

such as murder—always constitute aggravated felonies while other crimes qualify depending on the "term of imprisonment" imposed. (*Ibid.*) As relevant here, a theft offense is an aggravated felony only if the term of imprisonment imposed is at least one year. (8 U.S.C. § 1101(a)(43)(G).) The term of imprisonment includes "the period of incarceration or confinement ordered by a court of law regardless of any suspension of the imposition or execution of that imprisonment or sentence in whole or in part." (8 U.S.C. § 1101(a)(48)(B).)

According to Mendez, the People offered him a plea deal that would have given him credit for time served and required him to be on probation for three years. When the People offered the deal, Mendez had served less than a year in custody. Unless the court imposed and suspended a longer sentence, the term of imprisonment imposed under the deal would have been less than a year. Therefore, had Mendez accepted the offer, he likely would not have an aggravated felony on his record. Nor would he be permanently barred from becoming a citizen.

We will assume, for the sake of argument, that Mendez accurately recites the terms of the plea deal. We also will assume that Mendez did not understand the immigration consequences of accepting or rejecting the deal. Accordingly, the only issue for us to decide is whether Mendez is credible when he states he would have accepted the plea deal had he been aware of those consequences.

On that issue, only Mendez is able to provide direct evidence of his state of mind. Nevertheless, a "defendant's assertion as to his or her state of mind is not accepted at face value by courts evaluating a section 1473.7 motion. Such assertions must be corroborated with objective evidence."

(*Carrillo, supra*, 101 Cal.App.5th at p. 17; see *Espinoza, supra*, 14 Cal.5th at p. 321 [the moving party must provide objective evidence to corroborate factual assertions in a section 1473.7 motion]; see also *Vivar, supra,* 11 Cal.5th at p. 530 [courts have "long required" objective evidence to support a party's assertion he would not have entered a plea had he understood the immigration consequences].)  "Objective evidence includes facts provided by declarations, contemporaneous documentation of the defendant's immigration concerns or interactions with counsel, and evidence of the charges the defendant faced." (*Espinoza*, at p. 321.)

Here, the record lacks objective evidence corroborating Mendez's claim that he would have accepted the plea deal had he been aware of the relevant immigration consequences. At the outset, the difference in immigration consequences between accepting and rejecting the plea deal were not as stark as Mendez suggests.  As Mendez notes, under current law, a theft offense qualifies as an aggravated felony if it results in a prison sentence of at least one year.  (8 U.S.C. § 1101(a)(43)(G).) The triad for second degree robbery is two, three, or five years. (§ 213, subd. (a)(2).)  Therefore, under current law, any robbery conviction with a prison sentence imposed qualifies as an aggravated felony.

However, that was not the law in 1995, when the People offered Mendez the plea deal.  At that time, a theft offense qualified as an aggravated felony only if it resulted in a sentence of imprisonment of at least five years.[3]  (See former 8 U.S.C.

---

[3]    The amendments to the definition of aggravated felony are retroactive.  (See *Aragon-Ayon v. I.N.S.* (9th Cir. 2000)

9

§ 1101(a)(43)(G).)  Therefore, even with the one-year firearm enhancement (§ 12022, subd. (a)(1)), Mendez should have expected to suffer an aggravated felony only if the court selected the high term.  Given the People offered Mendez a deal with no prison time—and the court ultimately selected the low term —it seems highly unlikely Mendez would have anticipated receiving a high term sentence if he lost at trial.

More importantly, Mendez failed to produce any objective evidence showing the prospect of suffering an aggravated felony —however unlikely—was a motivating factor for him in 1995. The only negative immigration consequence of suffering an aggravated felony that Mendez identifies is the permanent bar to naturalization.  However, the record is completely devoid of objective evidence showing, as of 1995, Mendez cared about preserving his eligibility for naturalization.

The record shows Mendez has significant ties to the United States.  He has lived in this country for more than three decades, and he is the son, sibling, and father of United States citizens.  Yet, despite these deep connections, Mendez has never applied for citizenship, instead opting to renew his LPR status twice.

Nor is there evidence that Mendez had even considered the possibility of naturalization as of 1995.  According to Mendez's declaration, he first discovered his conviction rendered him ineligible for naturalization sometime around 2019, while

---

206 F.3d 847, 853.)  Therefore, when considering the current immigration consequences of Mendez's conviction, it is irrelevant that the conviction did not qualify as an aggravated felony when the court imposed the sentence.

10

he was researching the requirements to work for the FAA. Mendez does not claim he was seriously considering working for the FAA in 1995, and he fails to identify any other benefits of citizenship that were important to him at that time. Nor does he explain why—if naturalization had been a motivating consideration for him as far back as 1995—he waited more than two decades even to research whether he was eligible to apply for it.

In contrast to the lack of evidence that Mendez cared about preserving his eligibility for naturalization, there is ample evidence he had a strong desire to avoid a conviction. The People offered Mendez a favorable deal, agreeing to release him from custody immediately on the condition he plead guilty and serve three years on probation. In terms of time spent in custody, going to trial was necessarily a worse outcome. Indeed, because Mendez was in jail pending trial, he was certain to spend more time in custody by going to trial, even if the jury ultimately acquitted him. Under these circumstances, the only apparent motivation for Mendez to go to trial was to avoid suffering a felony conviction. Although the record does not disclose precisely why Mendez wanted to avoid a conviction, given he risked a significant prison sentence by going to trial—up to six years with the firearm enhancement—it seems that desire was particularly strong.

Applying our independent judgment and considering the totality of the circumstances, we conclude Mendez has not shown a reasonable possibility he would have taken a different path had he been aware of the relevant immigration consequences. Mendez failed to produce any objective evidence that, as of 1995, he meaningfully cared about preserving his

11

eligibility for naturalization.  In contrast, there is significant evidence that Mendez cared deeply about avoiding a felony conviction on his record.  Given these priorities, it is highly unlikely that Mendez would have accepted the People's plea deal had he understood that going to trial carried with it the risk of a permanent bar to naturalization.  That conclusion is bolstered by the fact that, under the law in effect at the time, such a result was relatively unlikely.  On the record before us, Mendez has not met his burden to show prejudice.  Accordingly, he is not entitled to relief.

## DISPOSITION

We affirm the order.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**



EGERTON, J.


We concur:




EDMON, P. J.




ADAMS, J.




12